**In re Sidney R. DIGBY, Debtor.**

**Bankruptcy No. 83–03634.**

United States Bankruptcy Court,
N.D. Alabama.

Feb. 26, 1985.

Dwight Rice, Anniston, Ala., for Central Bank of Oxford, N.A.

Thomas J. Knight, Anniston, Ala., for debtor.

FINDINGS AND CONCLUSIONS ON RE-QUEST FOR RELIEF FROM THE STAY PROVIDED BY 11 U.S.C. § 362(a)

L. CHANDLER WATSON, Jr., Bankruptcy Judge.

*Introduction—*

The above-styled case was commenced by a voluntary petition filed in the prior Court under chapter 11, title 11, United States Code, on July 6, 1983, and remains pending before this Court, under said chapter. On March 9, 1984, Central Bank of Oxford, N.A. (hereinafter referred to as Central) filed in this case a motion, seeking to have this Court terminate the stay imposed by 11 U.S.C. § 362(a), with regard to certain real property, described as follows:

> All that tract or parcel of land lying and being Lots Numbers 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31 and 32 in Block Three (3), of the Reaves Subdivision in Sections 26 and 35, Township 16, Range 7, Calhoun County, Alabama, according to a plat by H.B. Blackwell, C.E., dated July 1954, and recorded in Plat Book "F", Page 44, in the Office of the Judge of Probate of Calhoun County, Alabama.

In its motion, Central alleged that it had a mortgage on the real property lots. In the motion, it was further alleged that Central was not adequately protected for the following three reasons:

(a) Adequate protection payments are not being made.

(b) No disclaimer [*sic*] statement or plan has been filed on behalf of debtor even though order for relief was entered on July 6, 1983.

(c) Insurance coverage on the property has lapsed.

Central also alleged in its motion that the debtor did not have any equity in the real property and that the real property was not "required for reorganization."

The motion came before the undersigned bankruptcy judge for a hearing on April 3, 1984, at which an attorney for the debtor and an attorney for Central advised the Court that settlement of the controversy and dismissal of the motion were probable; and, upon written consent of Central's attorney, the bankruptcy judge entered an interlocutory order which continued in force the stay of steps to foreclose Central's mortgage.

On June 18, 1984, Central filed a motion to reset for hearing its prior motion for relief from said stay, and a continued hearing upon the original motion was held before the bankruptcy judge on July 17, 1984. Central blames the reappearance of the controversy upon the debtor's alleged failure to carry out promised payments to Central upon the mortgage debt. At the continued hearing, Central's attorney alleged that the debtor had paid to Central, since the hearing on April 3, 1984, the sum of $1,800.00, but that $1,000.00 of that sum had been paid since the filing of the motion to reset for hearing the original motion, and that the debtor was about $1,400.00 in arrears in payments on the mortgage debt.

The debtor's attorney alleged that the real property constitutes the debtor's residence and offered in evidence, without objection by Central's attorney, the county

tax assessor's 1983 tax returns on this real property, showing an appraisal value (in the aggregate, for land, residential building, and other improvements) of $45,810.00.

Central's attorney further alleged that the debtor had no equity in the real property because of over $55,000.00 in tax liens filed, and the debtor's attorney responded, as follows:

> ... I think Mr. Rice was referring to substantial income tax claims against Mr. Digby that exist. We concede they do exist, a large number of claims. We scheduled somewhere around $55,000 as disputed claims by the IRS and the state taxing authorities. They filed a substantial proof of claim. ...

The debtor's attorney argued that $12,000.00 was the total amount of the debt owed to Central at the time the case was commenced, according to the schedule filed by the debtor, and that *a creditor had filed a plan of reorganization*, which proposes a sale of the real property in question.

At the request of Central's attorney, the bankruptcy judge took judicial knowledge of the date when the case was commenced and that no disclosure statement or plan of reorganization had been filed by the debtor. At several points during the hearing, statements of fact by Central's attorney were admitted by the debtor's attorney. Nothing further being offered upon the motion, the matter was taken under advisement for a ruling by the Court.

*The Procedure—*

1973 Bankruptcy Rule 701 declared that an "adversary proceeding" included a proceeding instituted before a bankruptcy judge to "obtain relief from a stay as provided in Rule 401 or 601." Inasmuch as the provisions of 1973 Bankruptcy Rules 401 and 601 were similar to the provisions of 11 U.S.C. § 362(a), effective October 1, 1979,[1] most courts required that a request for relief from the stay provided for by § 362(a) be commenced by a complaint, instituting an adversary proceeding. Some

---

1. The Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, § 402(a) (1978).

courts initially held that a request for relief from this stay fell within the scope of "motion practice." Because this reduced the number of "adversary proceedings" handled by the latter courts and left them with undesirable statistical reports, such "motion practice" generally became impermissible.

The requirement that relief from the stay under § 362(a) be sought by a complaint, instituting an adversary proceeding, had an unfavorable effect upon the pocketbook of the party seeking the relief, since payment of a filing fee of $60.00 was required for the adversary proceeding—none for the filing of the motion. Relief for these financially oppressed parties was forthcoming, however, when the 1983 Bankruptcy Rules went into effect, on August 1, 1983. Admittedly, this was not the reason given by the Advisory Committee, which drafted the Rules. The 1983 Bankruptcy Rules (Rule 4001) converted the request for relief from said stay to a "contested matter," governed by "motion practice", under Rule 9014. The Rules Advisory Committee rested this change upon statements to the effect that the formalities of an adversary proceeding and the time for serving pleadings are not well suited to the expedited schedule for disposition of such a request, as provided by § 362(e), and that the "motion practice" gives the courts needed flexibility.[2]

Rule 9014, nevertheless, requires that the motion be served in the manner provided for service of a summons and complaint (Rule 7004) and that (unless the court otherwise directs) *23 of the other adversary proceedings rules shall apply.* But—unless the court orders that an answer be made to the motion—Rule 9014 provides that no response is required under that rule.

The principal changes in the procedure for obtaining relief from the stay provided by § 362(a), effected by the 1983 Bankruptcy Rules, appear to be: (1) the movant (generally a creditor whose claim is secured in whole or in part) is spared the burden of the $60.00 filing fee; and (2) no response to the motion is required by the Rules. Regardless of what one may wish to infer as being the goals and intentions of the Rules Advisory Committee, the changes thus wrought constitute what, in parlance, may be referred to as a "mixed blessing."

Under 1973 Bankruptcy Rule 755, a default judgment could be entered in the event that the defendant failed to plead or otherwise defend or was not ready to proceed on the trial date. When the motion for relief from the stay now comes before the Court, under the 1983 Bankruptcy Rules, there is generally no clue as to the stance to be taken by the debtor or trustee, unless the party against whom the relief is sought has volunteered an answer or the Court has ordered that a response be made. It does not seem reasonable to suppose that the Rules Advisory Committee could have intended that the bankruptcy judge order, in every instance, that a response be made to the motion for relief from the stay. If that were the assumption, the rules themselves should, of course, have provided that a response is required, unless the motion is to be taken as confessed by the party or parties against whom the relief was sought. When the response is not required and is not volunteered, the common condition at the hearing on the motion is confusion or uncertainty as to what is expected of, or required of, the moving party in order to obtain the relief sought.

---

2. ....
Unlike former Bankruptcy Rule 701, requests for relief from an automatic stay do not commence an adversary proceeding. Section 362(a) of the Code and Rule 4001 establish an expedited schedule for judicial disposition of requests for relief from the automatic stay. The formalities of the adversary proceeding process and the time for serving pleadings are not well suited to the expedited schedule. The motion practice prescribed in Rule 4001 is best suited to such requests because the court has the flexibility to fix hearing dates and other deadlines appropriate to the particular situation.
....
Excerpt from Advisory Committee Note on Rule 7001, Advisory Committee on Bankruptcy Rules, Judicial Conference of the United States.

The instant case is an example of one in which counsel for the creditor and counsel for the debtor appear to have had only very hazy conceptions of what would be required to advance the opposed interests of their clients. The movement toward informality which the Rules Advisory Committee apparently sought to promote in this area[3] appears to have been fully realized in this case.

*The Evidence—*

While it was obvious from the statements of counsel that Central wished to proceed with the foreclosure of its mortgage and that the debtor wished to prevent this, the only real evidence on the issue was presented when the Court was asked to take, and took, judicial knowledge that this case was commenced by the debtor on July 6, 1983, and that no disclosure statement or plan of reorganization had been filed by the debtor. This piece of evidence, coupled with Central's similar allegation, might tend to show "unreasonable delay by the debtor that is prejudicial to"[4] Central. If such unreasonable delay and resulting prejudice appeared, this could be "cause" for "terminating, annulling, modifying, or conditioning" the stay, as 11 U.S.C. § 362(d) would require.

The conclusion that there was no other real evidence does not result from the bankruptcy judge's having overlooked the debtor's exhibit—the copy of the tax assessor's returns, showing the property to have an appraised value of $45,810. This exhibit was—without doubt—offered by the debtor's attorney to establish the appraised value of the debtor's real estate—the debtor not being at the hearing and available to testify for this purpose. The exhibit does not establish the value of the real property, by reciting an appraised value of $45,810. What the exhibit proves is that the ad valorem taxes assessed against the subject property were fixed by multiplying $45,810 by the applicable tax rates.

The exhibit does not admit of any cross-examination of the stated "appraised" values. Nothing is revealed as to how, or by whom, the "appraised" values were determined. For aught shown, no inspection of the property was made by any direct or indirect means, no verification by any other method was made of any data used, and no training, experience, or other qualification was possessed by the person or persons who set the "appraised" values.

The Federal Rules of Evidence apply in bankruptcy cases,[5] and, thereby, "hearsay" is not admissible except as those rules permit.[6] The "appraised" values stated in the exhibit are "hearsay" because the "declarant" of such values did not make the statements "while testifying at the ... hearing,"[7] and the statements are not excepted from the prohibition.[8]

The tax-assessment returns are, as a whole, "hearsay," but Federal Rule of Evidence 803(8) excepts "[p]ublic records and reports" which set forth "the activities of the office." The debtor's exhibit shows those "activities" to have been a tax assessment based upon an "appraised" value of $45,810 but not that the property had a *value* of $45,810.

This result is not altered by the absence of an objection to the exhibit. The failure to object merely waived the requirement that the purported copy of the assessment return be authenticated as a true and complete copy of the return, there being no certification to that effect by the tax assessor.[9]

The following information concerning this matter was the gist of statements by Central's attorney which were conceded or affirmed by statements of the debtor's counsel:

---

**3.** See note 2 *supra.*

**4.** 11 U.S.C. § 1112(b)(3).

**5.** Bankruptcy Rule 9017.

**6.** F.R.E. 802.

**7.** F.R.E. 801.

**8.** See F.R.E. 803.

**9.** See F.R.E. 901 & 902.

1. Land and a dwelling thereon comprise the debtor's residence, which is the property in question;

2. Since the first hearing on Central's motion, the debtor has paid $1,800 to Central, on his debts, with $1,000 of that sum having been paid after Central's request for a continued hearing;

3. The debtor's payments were supposed to be paid monthly at a rate of $205.96 on one note and $147.40 on another note and were still about $1,300 in arrears;

4. The debtor's insurance policy on the property was cancelled, and Central had to procure and pay for insurance protection; and

5. There were outstanding tax claims against the debtor which amounted to about $55,000.

In addition, Central's attorney stated—without contradiction—the following:

1. Central held a mortgage on the subject property;

2. No regular payments were being made by the debtor to Central; and

3. The tax claims were liens upon the property and eliminated any equity above the mortgage debt.

Likewise, uncontradicted statements by the debtor's attorney encompass the following information concerning this matter:

1. The total debt owed by the debtor to Central was stated to be $12,000 in the schedule of creditors filed by the debtor in this case; and

2. A plan of reorganization had been filed—by a creditor—and included a provision for selling the debtor's "house."

*Consideration of the Evidence—*

A determination of the facts before the Court on this matter requires some further reference to the Federal Rules of Evidence, some reference to the Federal Rules of Civil Procedure, and some consideration of the role of the Court.

Federal Rule of Civil Procedure 43, "Taking of Testimony,"[10] provides:

10. Made applicable by Bankr.Rule 9017.

(a) Form. In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by an Act of Congress or by these rules, the Federal Rules of Evidence, or other rules adopted by the Supreme Court.

. . . .

(e) Evidence on Motions. When a motion is based on facts not appearing of record the court may hear the matter on affidavits presented by the respective parties, but the court may direct that the matter be heard wholly or partly on oral testimony or deposition.

. . . .

Here, no evidence was offered by affidavit, oral testimony, or deposition. The only evidence submitted was the purported copy of the ad valorem tax assessment on the property and the judicial knowledge taken by the court of the fact that the debtor had not filed a plan during the pendency of the case for more than one year. Because of the minute amount of the evidence and the large volume of statements by counsel, consideration must be given to what more, if anything, the Court is to consider by way of judicial knowledge and what effect, if any, is to be given to the statements of counsel.

■ Rule 201 is the only Federal Rule of Evidence dealing with "judicial notice." Subdivision (a) limits the rule's applicability to "only judicial notice of adjudicative facts," as contrasted with "legislative" facts. Subdivision (b) requires that a judicially-noticed fact be "one not subject to reasonable dispute," and subdivision (c) gives a court discretion to take judicial notice, "whether requested or not." A party is entitled to be heard "as to the propriety of taking judicial notice and the tenor of the matter noticed," upon timely request, as provided by subdivision (e), which further provides that "the request may be made after judicial notice has been taken," in the absence of prior notification. Subdivision (f) allows judicial notice to "be taken at any stage of the proceeding." In view

of this last provision and the specific provision for an opportunity for a party to be heard, after judicial notice has been taken, it is clear that the Court may—if appropriate—take judicial notice now of matters in addition to the ones for which a request was made by Central's attorney at the hearing.

■ Because the taking of judicial notice of a fact by a bankruptcy judge is regulated by the Federal Rules of Evidence only if the fact is an "adjudicative fact," [11] the distinction between this type of fact and a "legislative fact" must be noted. An "adjudicative fact" concerns the parties to a proceeding, as contrasted with a "legislative fact" which is general and broad and relates to the parties not as individuals or particular entities but unspecifically.[12]

As Professor [Kenneth] Davis points out,[13] ... every case involves the use of hundreds or thousands of non-evidence facts. When a witness in an automobile accident case says "car," everyone, judge and jury included, furnishes, from non-evidence sources within himself, the supplementing information that the "car" is an automobile, not a railroad car, that it is self-propelled probably by an internal combustion engine, that it may be assumed to have four wheels with pneumatic rubber tires, and so on. The judicial process cannot construct every case from scratch, like Descartes creating a world based on the postulate *Cogito, ergo sum.* These items could not possibly be introduced into evidence, and no one suggests that they be. Nor are they appropriate subjects for any formalized treatment of judicial notice of facts. ....[14] [footnotes added].

In hearing a motion which must rest upon evidentiary burdens or burdens of proof, as is the case with a motion seeking relief from the stay provided by 11 U.S.C. § 362(a), the court's task is made considerably more complex when counsel seem to assume that everyone knows what the problem or dispute rests upon and that counsel need only state to the judge selected facts and a conclusion therefrom favorable to counsel's client. The court then is confronted with deciding not only what does the evidence presented (if any) establish but what effect, if any, is to be given to the unsupported statements of the attorneys. The statements of counsel do not present this problem, of course, if confirmed or admitted directly by opposing counsel. The problem is with those assertions which opposing counsel do not challenge—which slide by—or as to which opposing counsel's response is ambiguous.

In *Dahlberg Company v. American Sound Products, Inc.,* 179 F.Supp. 928 (D.Mn.1959), Judge Nordbye stated: "[i]nformal statements of counsel in their briefs cannot be considered." [15] This postulate may be entirely correct in the context of that case—on a question of agency, upon which the court's jurisdiction depended—but it is too rigid for an evidentiary hearing before the court on a motion seeking relief under § 362(d). Here, an unchallenged statement of counsel may often bear great resemblance to an adoptive admission of a party, and should not be coldly rejected from all consideration by the court. This position is strengthened by the policy embodied in Federal Rule of Evidence 102, where it is stated that the rules are to "be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined."

11. Fed.Rule of Evid. 201(a).

12. See Black's Law Dictionary, 39, "[a]djudicative facts" (5th ed. 1979).

13. Davis, A System of Judicial Notice Based on Fairness and Convenience, in Perspectives of Law 69, 73 (1964).

14. 2 Moore's Rules Pamphlet with Comments, Federal Rules of Evidence, 41 (1984).

15. 179 F.Supp. 932.

In Federal Rule of Evidence 801(d)(2), an "[a]dmission by [a] party-opponent" is within the definition of what statements are not "hearsay."[16] Basically, for a statement to be an *adoptive* admission, it must be offered against a party and be "a statement of which he has manifested his adoption or belief in its truth."

Few difficulties arise if the adoption, which can be expressed either in words or by conduct, is unambiguous. But sometimes behavior, verbal or otherwise, is susceptible of more than one interpretation. ...

The most troublesome cases—because they involve the most ambiguous response—are those where the party remains silent after a statement damaging to him is made in his presence. The theory underlying admission is that the normal human reaction would be to deny such a statement if untrue. But the truth of this generalization turns on a number of factors including the circumstances in which the accusation is made, by whom it is made, and the physical and psychological state of the particular person involved. ... [Footnotes omitted].[17]

This excursion into the areas of procedure and evidence involved in a request for relief from the stay under § 362(a) of the bankruptcy statute seems to be excessive for only the matter involved in the present case, but a reoccurring problem is demonstrated here. The journey has been instructive to the Court and, hopefully, will be to legal counsel, with some resultant benefit to the court procedures involved.

When all of the factors are considered, the Court is put to the task of about deciding the issues on the basis of how the attorneys or parties tried the matter before the Court. This is another way of saying that the matter about rests upon the assumptions inherent in the manner in which the attorneys presented the motion to the Court for a decision.

For the decision of the Court to rest upon a determination by the Court of the assumptions made by legal counsel is not satisfactory in this district, where the bankruptcy judges are required to make hundreds of determinations and decisions each month. It leaves far too much to speculation and hazy recollection by the judge. Legal counsel should take note of this problem and should pursue *before* the hearing the possibility of obtaining stipulations of fact and admitted documentary evidence. Attorneys for parties to stay litigation—in the absence of adequate fact stipulations and admissions—should not naively assume that opening statements of counsel will be a satisfactory substitute for the absent (and unsubpoenaed) witness and missing documentary proof of *creation and perfection* of a security interest or lien in or upon collateral which is the subject of the litigation. Counsel should not place child-like reliance upon the magic of the modern copying machine which, when used by an indifferent operator, often produces an infuriating irritant of frustration instead of Exhibit "A".

*Findings of Fact—*

Confronted with a choice of following a rule of strict proof and resting the decision upon an artificial case or of determining this matter on the basis of what seem to be the obvious facts, the Court chooses the latter and finds the facts in this proceeding to be as follows:

1. The debtor was about $1,400 in default in making payments to Central on loans from Central, as to which the agreed payments equalled $353.36 per month;

2. The balance of the debt was approximately $12,000, secured by a mortgage on the debtor's real property, which constituted the debtor's residence;

3. The debtor's residence consisted of a dwelling house and related land, which had a value in the neighborhood of $45,000;

---

**16.** Federal Rule of Evidence 802 provides in general effect that "hearsay" is not admissible in evidence, except as permitted by Rules 803 and 804.

**17.** 4 Weinstein's Evidence ¶ 801(d)(2)(b)[1], pp. 801–144 & 145 (1981).

4. Claims for taxes, amounting to approximately $55,000, were secured by tax liens against the debtor's residence;

5. Central's mortgage had been filed for record long before the filing of notices of the tax liens; thus, the mortgage was a senior lien against the debtor's residence, in relation to the tax liens;

6. The only plan of reorganization filed in this case was one proposed by two creditors, on April 27, 1984, and it provided for sale of the debtor's nonexempt real and personal property, with payment of liens from the proceeds of sale; and

7. After the initial hearing on the motion on April 3, 1984, the debtor had paid to Central $1,800, but $1,000 of that sum was paid after (if not prompted by) the filing by Central of a motion to reset this matter for a hearing.

*Conclusions by the Court—*

The question now is whether, upon the facts found, the Court "shall grant relief from the stay" to Central, "such as by terminating, annulling, modifying, or conditioning" the stay provided for in section 362(a).[18] The statute requires such relief, if "cause" exists or if the policy-procedure condition exists, where the "debtor does

**18.** 11 U.S.C. § 362(d).

**19.** 11 U.S.C. § 362(d) reads as follows:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

**20.** *Id.*

**21.** There is an obvious need to keep this concept of a "value cushion" separate from the term "equity" of the debtor, which in conjunction with a lack of necessity of the property to an effective reorganization will require granting of relief from the stay under section 362(a). As

not have an equity in such property [,] and such property is not necessary to an effective reorganization."[19] The statute contains a construction imperative that "cause" includes "the lack of adequate protection of an interest in property of" the party requesting the relief.[20]

■ Taking up that issue first, it is obvious that there is no lack of protection of Central's interest in the debtor's residence. Central's mortgage lien stands ahead of the $55,000 aggregate of tax liens. Only the annual liens of ad valorem taxes on the property would come ahead of the mortgage, and there is no indication that any such tax is past due. Annual ad valorem taxes would not be of significant amounts here.

Comparing the value of the property ($45,000) to the mortgage debt ($12,000) shows that there exists a "value cushion"[21] of approximately $33,000, which adequately protects Central's interest in the real estate. That interest is a mortgage lien to assure repayment to it of the principal-debt balance of $12,000 and Central's expenditure for a hazard insurance premium and payment of interest on the debt.

stated by Judge Meyers in *La Jolla Mortg. Fund v. Rancho El Cajon Associates,* 8 B.C.D. 1035, 18 B.R. 283 (B.C.S.D.Ca.1982), use of the term "equity cushion" is a misnomer and contributes to confusion of the issue of whether a creditor's interest in the debtor's property is adequately protected and the separate issue of whether relief from the stay should be granted because of an absence of any "equity" of the debtor in the property and an absence of need for the property for an effective reorganization.

Because the debtor's lack of an "equity" was equated by the bankruptcy court with a lack of "adequate protection" of the creditor's interest in the subject property, the court's lifting of the stay was reversed in *In re Mellor* 734 F.2d 1396, Bankr.L.Rep. (CCH) ¶ 69,899 (9th Cir.1984).

The term "equity cushion" is but one of several unfortunate terms which unnecessarily contribute to muddled issues in the bankruptcy courts, but it has had a wide use and probably will linger on. *See, e.g., In re Mellor, supra; In re Development, Inc.,* 36 B.R. 998 (B.C.D.Hi. 1984); *In re Mikole Developers, Inc.,* 14 B.R. 524 (B.C.E.D.Pa.1981); and cases cited in *La Jolla Mortg. Fund v. Rancho El Cajon Associates, supra.*

■ When "adequate protection" of a creditor's interest in the debtor's property is an issue under section 362(d), section 361 of title 11 provides three examples of how "adequate protection may be provided." It is obvious that these examples are not exclusive and that the collateral may have a value sufficiently in excess of the value of the interest of the movant in the debtor's property adequately to protect the interest of the movant,[22] as is the case here.

Because of the large "value cushion" in this case, there is no problem of "adequate protection" of the "time-use" value of the moving party's interest in the debtor's property, as was the issue in *In re American Mariner Industries, Inc.*[23]

■ Next, the Court must consider whether there is other "cause" for granting relief from the stay. Central complained that the debtor's payments after the preliminary hearing on the motion had been less than promised at that time, that the major portion had been paid after Central filed a motion to have this matter reset before the Court, that Central had been forced to provide hazard insurance for the debtor's property because the debtor allowed the insurance to lapse, and that the debtor had not filed a plan or a disclosure statement during the life of the reorganization case, from July 6, 1983, through July 17, 1984. None of these complaints or all taken together constituted more than aggravation of Central, as of the last hearing—certainly insufficient cause for granting Central leave to proceed with a foreclosure of its mortgage.

This is not to be taken as an endorsement of aggravation of Central. Nor is it to say that, under no circumstances, the deprivation of payment to a creditor who is injured thereby may not be such cause to vacate the stay. It may be such cause,

even if the creditor's interest in the property otherwise is adequately protected by a "value cushion."[24] An iron-clad guarantee of the delinquent delivery of a loaf of bread is not an equivalent for the promisee who starves in the meantime—even if a measure of butter is added for the delay.

■ Finally, there remains the question of double inquiry. Does the debtor have an "equity" in the property? If not, is the property necessary for an effective reorganization? When both inquiries produce a negative finding, the Court must grant relief from the stay provided by section 362(a). This is not because of "cause," as such, but because Congress had determined that the property has not significant bearing upon the reorganization case and that, therefore, there is no sufficient policy or procedural consideration which justifies barring a creditor from exercising the rights regarding the property which contract or statute afford.

■ In the present case, the debtor does not have an "equity" in the property as the term "equity" is generally understood and as used in section 362. The term describes an owner's interest in property which is subject to one or more liens or other encumbrances and refers to the value of the property in excess of the sum or sums secured by the encumbrances.[25] Here, there is no value in excess of the mortgage debt and tax liens, in the aggregate.

■ Although the debtor does not have an "equity" in the property, it cannot be said that the "property is not necessary to an effective reorganization." The only plan of reorganization proposed provides for the sale of the debtor's nonexempt property, with payment of liens from the proceeds of sale. The residence would not be exempt from sale, as to the mortgage

**22.** *In re Mellor,* 734 F.2d 1396, Bankr.L.Rep. (CCH) ¶ 69,899 (9th Cir.1984); *La Jolla Mortg. Fund v. Rancho El Cajon Associates,* 8 B.C.D. 1035, 18 B.R. 283 (B.C.S.D.Ca.1982).

**23.** 734 F.2d 426, Bankr.L.Rep. (CCH) ¶ 69,886 (9th Cir.1984).

**24.** *Cf. In re Sewanee Land Coal & Cattle, Inc.,* 21 B.R. 813 (B.C.N.D.Al.1982); *appeal dismissed,* 735 F.2d 1294 (11th Cir.1984).

**25.** *Contra, Matter of Spring Garden Foliage, Inc.,* 15 B.R. 140 (B.C.M.D.Fl.1981).

debt or the tax liens. Retention of this piece of property is necessary to effect an orderly and effective payment upon the tax liens of the maximum sum which may reasonably be expected. Mortgage-foreclosure sales from the courthouse steps are generally reputed to bring no more than the mortgage debt and the costs of sale.

Subsection (g) of section 362 places the burden of proof upon the party requesting relief from the automatic stay only as to the issue of the debtor's equity in the property. The debtor's lack of an equity in the property is clearly established, but the property is necessary for an effective reorganization, because that concept includes protection of the ability of the debtor or a trustee to liquidate the property and pay upon the tax liens the excess of proceeds of sale after payment of the mortgage debt. The burden of proof upon the debtor to establish that the mortgagee's interest in the property is adequately protected has been met by showing that a large "value cushion" exists. Thus, there is no "cause" from this area for granting relief from the stay.

The movant having the burden of proof on the issue of the debtor's equity in the property, the statute places upon the party opposing relief from the stay "the burden of proof on all other issues." This does not mean that the debtor must raise and then negate every conceivable "cause" for granting relief from the automatic stay, which is similar to a preliminary injunction—yet different.

The ground for interposing the automatic stay is Congressional policy that the status quo be maintained in a bankruptcy case until orderly modified. The ground for issuance of a preliminary injunction must be established by the party seeking it. The effect of the two is similar. When either is challenged, the party opposing the granting of the relief has most of the burden of having it maintained.

But when it is the automatic stay which is challenged, the Congressional policy (which stands as the ground for its existence) remains in force, on all issues not raised by the party seeking to have the stay lifted. There is even less reason for the Court to deal with any issue not raised by the moving party than there may be in regard to a preliminary injunction.

The matter before the Court does not require it to deal with inordinate delay on the part of the debtor which may be harmful to some other creditor or creditors. The Court is not dealing with whether a creditor or the United States trustee should require that the debtor wake up, or that the debtor should walk over to chapter 7 or out of court, or that a case trustee should walk in.

An Order denying Central's motion will be separately entered.